JOSEPH F. MAGUIRE,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              10-11334-MBB

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration,
        Defendant.



**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE**
**COMMISSIONER OR IN THE ALTERNATIVE REMANDING THE CLAIM FOR A NEW**
**ADMINISTRATIVE HEARING (DOCKET ENTRY # 15); DEFENDANT'S CROSS**
**MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 19)**

**July 21, 2011**

**BOWLER, U.S.M.J.**

        Pending before this court are cross motions by the parties,

plaintiff Joseph F. Maguire ("plaintiff") and defendant Michael

J. Astrue, Commissioner of the Social Security Administration

("Commissioner").  Plaintiff filed a motion to reverse the

Commissioner's decision or, in the alternative, to remand the

matter for a new administrative hearing.  (Docket Entry # 15).

The Commissioner moves for an order affirming the denial of

benefits.  (Docket Entry # 19).  After the parties filed a joint

motion to waive the hearing (Docket Entry # 23), this court took

the motions (Docket Entry ## 15 & 19) under advisement.

On September 4, 2008, plaintiff filed an application for
Social Security Disability Insurance ("SSDI") benefits and
Supplemental Security Income ("SSI") with the Social Security
Administration alleging disability since December 6, 2004. (Tr.
92-102). The Commissioner denied these claims on November 25,
2008. (Tr. 52-55). On December 31, 2008, plaintiff filed a
request for reconsideration. (Tr. 57). This request was denied
with respect to both claims on March 5, 2009. (Tr. 60-62, 63-
65). On March 18, 2009, plaintiff submitted a request for a
hearing before an administrative law judge ("ALJ"). (Tr. 66).
The hearing took place on March 11, 2010. (Tr. 19-47). On March
26, 2010, the ALJ denied plaintiff's claims. (Tr. 4-14).

In his decision, the ALJ found that plaintiff had a severe
physical impairment but that his impairment did not meet the
requirements under Listing 1.02, 20 C.F.R. § 404, sub. P, appx. 1
("Listing 1.02"). (Tr. 10). Specifically, the ALJ determined
that plaintiff's leg pain failed to meet the requirements for a
major dysfunction of the joints "because there is no evidence of
gross anatomical deformity." (Tr. 10). The ALJ further found
that, though plaintiff was disabled from continuing his past
relevant work in the construction industry, he retained a
residual functional capacity ("RFC") for sedentary unskilled
work. (Tr. 10-12). The ALJ concluded that plaintiff was not

disabled under the Social Security Act.  (Tr. 14).  The Decision
Review Board ("DRB") selected plaintiff's claims for review.
(Tr. 4).  When the 90 day allotted time period had expired on
July 9, 2010, however, the DRB had not completed its review and
the ALJ's decision became final.  (Tr. 1).  On August 9, 2010,
plaintiff filed the complaint requesting a reversal or, in the
alternative, remand pursuant to 42 U.S.C. § 405(g).  (Docket
Entry # 1).


### FACTUAL BACKGROUND

Plaintiff was 36 years old on April 16, 1998, when he
sustained an injury to his legs.  (Tr. 278-279).  Plaintiff
attended high school through the 11th grade.  (Tr. 23).  Between
1980 and 1984, plaintiff served in the United States Navy.  (Tr.
94).  While he was in the Navy, plaintiff succeeded in obtaining
his GED.[1]  (Tr. 23-24).  After leaving the Navy and until his
injury, plaintiff worked as a siding and window installer and a
roofer.  (Tr. 25).  Plaintiff testified that he has never used a
computer, balanced a checkbook or supervised other construction
workers.  (Tr. 34-35).

On April 16, 1998, plaintiff fell from a ladder and landed
over a railing.  (Tr. 279).  Emergency room records indicate that

---

[1]  GED is an acronym for general equivalency diploma.

plaintiff's right foot was facing backwards after he fell. (Tr. 279). X-rays were taken of plaintiff's pelvis, chest, tibia, fibula and femur. (Tr. 255, 257, 265, 274, 275, 276 & 277). Plaintiff's right leg showed a "comminuted displaced fracture of the distal femur." (Tr. 256). On April 17, 1998, plaintiff underwent surgery for his right femur under the care of Paul Kamins, M.D. ("Dr. Kamins"). (Tr. 284-285). The fracture was repaired using a 16 inch long metal plate and 18 screws. (Tr. 33). Also on April 17, 1998, x-rays were taken of plaintiff's clavicle and elbow, showing no abnormalities. (Tr. 259, 260, 270 & 272). X-rays of plaintiff's left knee, however, revealed a "minimally displaced comminuted fracture of the patella with associated joint effusion, possibly hemorrhagic." (Tr. 261). On April 18, 1998, CAT scans of plaintiff's left knee confirmed the patella fracture with joint effusion and a "large amount of soft tissue swelling."[2] (Tr. 262). X-rays of plaintiff's right leg on April 19, 1998, showed that the plate and screws in plaintiff's femur were in place and that the "fracture fragments [were] in good position." (Tr. 268). On April 20, 1998, plaintiff had surgery to repair his left knee. (Tr. 286). Wires were placed encircling the joint and the ends were "bent and impacted into the bony surface." (Tr. 286). A fluoroscopy view

_____

[2]  CAT is an acronym for computerized axial tomography.

4

of plaintiff's left knee on April 21, 1998, showed the wire holding the fracture in place. (Tr. 264).

On April 23, 1998, plaintiff was discharged from the hospital. (Tr. 282). Dr. Kamins prescribed Percocet and Asprin as part of his immediate recovery. (Tr. 287-288). Dr. Kamins continued to treat plaintiff between April 1998 and August 1998. (Tr. 289-290). Plaintiff's recovery consisted primarily of home physical therapy, as plaintiff did not have insurance. (Tr. 289). On May 22, 1998, additional x-rays were taken of plaintiff's right femur and left patella. Fracture lines extended along the right femur, but the alignment of the fracture was anatomic and showed no sign of infection. (Tr. 266). The left patella was still in place with the surrounding hardware, though a slight displacement of a fragment was noted. (Tr. 289). Between April 16 and July 13, 1998, plaintiff could not bear weight on his right leg and ambulated with the aid of crutches. (Tr. 289). Between July 13 and August 3, 1998, plaintiff continued to use crutches though he progressed to partial weight bearing on his right leg. (Tr. 289).

On October 5, 1998, plaintiff began treatment with Maria Rodriguez, M.D. ("Dr. Rodriguez"). Dr. Rodriguez noted that plaintiff showed signs of good recovery but that "he still continues to have some discomfort in both knees and is still unable to work." (Tr. 295). She also noted that plaintiff was

no longer able to afford his pain medication and that he is
"currently devastated from the fact that he cannot work and
support his family." (Tr. 295). Dr. Rodriguez prescribed
Percocet and recommended that plaintiff follow up with an
orthopedic surgeon. (Tr. 296). She concluded, "[o]therwise, he
is a healthy gentleman." (Tr. 296).

On March 12, 1999, Dr. Rodriguez's notes report that
plaintiff wished to return to work. (Tr. 297). Plaintiff was
improving but he still walked with a limp and had pain in both
knees and lower back. (Tr. 297). Dr. Rodriguez ordered further
x-rays and referred him to an orthopedist. (Tr. 297). On March
17, 1999, x-rays of plaintiff's right leg revealed a "sclerotic
lesion within the proximal right femur." (Tr. 292). The right
knee was described as "near anatomic" and the left knee was
"unremarkable." (Tr. 292). On March 25, 1999, plaintiff visited
an orthopedist, George C. Brown, M.D. ("Dr. Brown"), who noted
"rather dramatic quadriceps atrophy" in both legs.

In May 1999, after 13 months of recovery, plaintiff returned
to work as a window and siding installer. (Tr. 35, 181 & 301).
He continued to work in that capacity until December 2004. (Tr.
35-36). From 2000 to 2004, plaintiff earned between $31,237 and
$42,313 annually. (Tr. 103). Plaintiff had no annual earnings
after this period. (Tr. 103-104).

On July 14, 2003, plaintiff visited the emergency room with

pain in his right hip. (Tr. 181). The initial assessment
indicated that he had "hip pain radiating down front of leg to
knee cap - known trauma - pain when walking - numbness/tingling."
(Tr. 185). Craig A. Warnick, M.D. ("Dr. Warnick"), who the
record identifies as plaintiff's primary care physician at this
time, prescribed Percocet and ordered x-rays. (Tr. 183). The
radiology report revealed a sclerotic lesion in plaintiff's right
femur and "degenerative changes in the lower lumbar spine." (Tr.
193). On July 21, 2003, a bone scan showed signs of
"degenerative change and/or injury" in plaintiff's lower back and
an abnormality on the right femur which "most likely represents a
benign etiology." (Tr. 195).

On December 6, 2004, plaintiff experienced severe pain in
his left knee at which point plaintiff claims he became
permanently disabled. (Tr. 92). On December 10, 2004, plaintiff
underwent surgery to remove as much of the "painful and somewhat
prominent" hardware as possible from his left knee. (Tr. 189-
190). After leaving work, plaintiff received $100,000 in
workers' compensation benefits. (Tr. 28 & 35).

Plaintiff began treatment with Richard S. Fraser, M.D. ("Dr.
Fraser") on June 29, 2005. (Tr. 301). Dr. Fraser indicated that
plaintiff had received "no further medical care" since December
2004. (Tr. 301). In a letter to plaintiff's attorney, Dr.
Fraser detailed plaintiff's injury, recovery and subsequent work

activities. Dr. Fraser states that plaintiff's decision to return to construction work between 2000 and 2004 exacerbated his condition and contributed to his present disability. (Tr. 301). Following surgery, plaintiff's left knee improved but his right knee grew increasingly more painful. (Tr. 302). In Dr. Fraser's opinion, plaintiff had "reached a medical endpoint. Even with conservative treatment or other surgical procedures, he would be at significant risk of aggravating his current condition should he return to his prior employment." (Tr. 303). Dr. Fraser recommended some conservative measures including "ice therapy, range of motion exercises as well as the use of orthotics such as a knee brace and a cane if walking for more than five minutes." (Tr. 302). Dr. Fraser concluded that plaintiff could do sedentary work with restrictions against standing or walking for more than 15 minutes and a lifting restriction of ten pounds. (Tr. 303).

On October 11, 2005, plaintiff visited Dr. Fraser for a follow up evaluation. (Tr. 238). Plaintiff's left knee was doing well with only minimal pain after prolonged walking, though plaintiff did experience occasional buckling. (Tr. 238). Plaintiff's right knee, however, caused him "constant pain" with swelling and frequent buckling. Dr. Fraser concludes, "it is my professional opinion that he is totally disabled from gainful employment for the foreseeable future." (Tr. 238).

On December 7, 2006, plaintiff visited Dr. Fraser for another evaluation. (Tr. 237). Plaintiff was experiencing chronic lower back pain with "[m]oderate spasm, tenderness." (Tr. 237). Plaintiff also had stiffness, swelling and tenderness in his right knee. Though his left knee had improved, plaintiff still exhibited "some rigidity, crepitance over the patella." (Tr. 237). Dr. Fraser also noted that plaintiff walked with a "moderate antalgic gait" and used a cane at all times. (Tr. 237). Dr. Fraser reiterates that plaintiff would be able to do sedentary work with a lifting restriction and a restriction on prolonged walking or standing, but added that plaintiff would require "the ability to change positions every ten minutes, wear a knee brace and use a cane. He would also require periods of rest if sitting for prolonged periods and would likely be absent on one or two days a week." (Tr. 236).

On January 12, 2007, Dr. Fraser reported that plaintiff "has developed an arthropathy of the lumbar spine" due to the strain his leg injuries placed on his back. (Tr. 235). At this point, Dr. Fraser notes that plaintiff was only able to walk for five minutes while using a cane before he required rest. (Tr. 235). On August 23, 2007, Dr. Fraser noted no change in plaintiff's condition. (Tr. 234). On each of these occasions, Dr. Fraser concluded that plaintiff was "disabled from any gainful employment." (Tr. 234 & 235).

On February 18, 2008, plaintiff visited the emergency room
with right thigh pain, swelling and tenderness. (Tr. 177). The
initial assessment reported that plaintiff had a pain scale of
ten but also determined that he was steady and not at risk of
falling. (Tr. 178). An x-ray was ordered and Darvocet was
prescribed for the pain. (Tr. 177). The x-ray showed a "large,
approximately 4 cm poorly defined sclerotic density within the
proximal femur." (Tr. 199). A telephone follow up confirmed
these results and added a recommendation for an appointment with
Dr. Brown and a bone scan. (Tr. 182).

On February 21, 2008, Dr. Fraser noted that plaintiff
continued to experience pain in his legs and lower back and was
"extremely limited in his functionality." (Tr. 233). Dr. Fraser
also reported that plaintiff "has become very despondent about
his condition," particularly in light of his recent divorce.
(Tr. 233). Dr. Fraser suggested that the increased pain and
swelling in his right leg might be caused by a "small fracture or
possibly a bony lesion" and he prescribed Darvocet. (Tr. 233).
On February 26, 2008, a three phase bone scan revealed
abnormalities in the proximal right femur due to an undetermined
sclerotic legion as well as abnormalities in the distal femur
which were attributed to the presence of the metal plate. (Tr.
200). On February 29, 2008, plaintiff visited Dr. Brown. Though
Dr. Brown did not find any tenderness or swelling in plaintiff's

right leg, he noted that plaintiff's pain corresponded to abnormalities on the bone scan and he recommended an MRI.[3] (Tr. 210).

On March 4, 2008, plaintiff stopped receiving worker's compensation. (Tr. 100). On June 24, 2008, plaintiff visited Dr. Warnick to request a note so that he could return to work. (Tr. 209). During the hearing before the ALJ, plaintiff testified that he tried to return to work after he had depleted his workers' compensation benefits, saying, "I was struggling to pretty much live day to day." (Tr. 28). In plaintiff's memorandum in support of the motion for an order reversing or remanding the decision of the Commissioner, plaintiff argues that he could not find work at this time because the pain in his right leg made it impossible for him to perform his essential job functions. (Docket Entry # 16). The Commissioner argues that plaintiff was unable to find work because his history of work related injuries made him an undesirable candidate to employers. (Docket Entry # 20).

On September 4, 2008, plaintiff filed an application for SSDI and SSI alleging disability since December 6, 2004. (Tr. 92-98 & 99-102). On September 18, 2008, plaintiff submitted a function report detailing his daily activities. (Tr. 119-126).

---

[3] MRI is an acronym for magnetic resonance imaging.

Plaintiff stated that he lives with his brother and spends his days watching television, reading books and helping his brother around the apartment. (Tr. 119 & 123). Plaintiff also reported that his disability makes it uncomfortable to sleep and keeps him from working or lifting anything heavy. (Tr. 120, 122 & 123). Plaintiff explained that he uses a cane when walking and that the weakness in his legs has caused pain to spread to his lower back and upper neck. (Tr. 126).

On November 24, 2008, Malavalli Gopal, M.D. ("Dr. Gopal") reviewed plaintiff's records and determined that he is not disabled. (Tr. 48 & 49). Dr. Gopal's physical residual functional capacity assessment ("PRFC") states that plaintiff is frequently able to lift or carry ten pounds and occasionally lift 20 pounds; plaintiff is able to stand or walk for three to four hours and able to sit for about six hours; and plaintiff is frequently able to stoop and crouch and occasionally climb, balance, kneel and crawl. Dr. Gopal's assessment indicated that plaintiff should avoid pushing or pulling with the lower extremities or concentrated exposure to hazards. (Tr. 224 & 227). Dr. Gopal's basis for his assessment is unclear because his PRFC indicates that he did not consult the statements of a treating or examining source and his disability determination indicates that "no medical evidence [was] on file." (Tr. 48 & 229). Further, Dr. Gopal's PRFC states that plaintiff sustained

his injuries during an automobile accident.  (Tr. 224).

On November 25, 2008, plaintiff's application was denied.
(Tr. 52).  The decision states that it relied on reports from Dr.
Warnick and Brockton Hospital.  (Tr. 52).  The statements in the
decision, however, appear to reflect Dr. Gopal's assessment,
including his inaccurate account of plaintiff's injury.

On December 12, 2008, plaintiff visited Dr. Fraser for
another evaluation and he appeared to be much improved.  Dr.
Fraser noted that plaintiff was exercising and had full range of
motion in both legs with only "minimal crepitance."  (Tr. 232).
Dr. Fraser described plaintiff's condition as "exceptionally
normal."  (Tr. 232).  Dr. Fraser gave plaintiff a note to return
to work with a restriction against lifting more than 25 pounds or
doing repetitive motions.  (Tr. 232).

Plaintiff submitted a request for reconsideration of his
denied application on December 31, 2008.  (Tr. 57).  In his
request, plaintiff asserted, "A combination of my physical
impairments render me incapable of performing substantial gainful
employment."  (Tr. 57).

On February 24, 2009, John Jao, M.D. ("Dr. Jao") reviewed
plaintiff's records and Dr. Gopal's PRFC.  Like Dr. Gopal, Dr.
Jao did not consult statements from a treating or examining
physician.  (Tr. 245).  Dr. Jao's PRFC, however, included an
accurate description of plaintiff's injury.  Dr. Jao determined

13

that plaintiff is frequently able to lift ten pounds and occasionally lift 20 pounds; plaintiff is able to stand, walk or sit for six hours a day; and plaintiff is frequently able to climb, balance and stoop and occasionally kneel, crouch or crawl. (Tr. 240-241). Dr. Jao relied on plaintiff's December 2008 evaluation which showed improvement. Dr. Jao's assessment therefore does not include restrictions against pushing or pulling with the lower extremities or exposure to hazards. (Tr. 240 & 243).

On March 5, 2009, plaintiff's request for reconsideration was denied for both his SSDI and his SSI claims. (Tr. 60-62 & 63-65). The decision states, "You can be on your feet most of the day" and "[y]ou can do occasional climbing of ladders, ropes and scaffolds." (Tr. 60 & 63). The decisions further assert that although plaintiff is unable to return to construction work, he is not prevented from doing other kinds of work. (Tr. 60 & 63).

On March 11, 2009, plaintiff submitted remarks objecting to the Commissioner's characterization of his abilities and pain levels. According to plaintiff, "Soc. Security say's [sic] I can do alot [sic] of things that they could not possibly say I can do without having the same injuries themselve's [sic] and without even sending me to a Doctor to be evaluated." (Tr. 107). On March 17, 2009, plaintiff submitted a questionnaire on pain, in

which he indicated that he experiences constant pain in his right hip, femur and knee, his left knee and his back. (Tr. 138). Plaintiff used to take Darvocet or Percocet to control the pain, but he no longer has insurance to pay for it. (Tr. 139). To relieve his pain, plaintiff takes over the counter medications and lies down. Plaintiff reported, however, that the pain did not interrupt his ability to perform household chores on a typical day. (Tr. 139).

Also on March 17, 2009, plaintiff's friend Lynn Porter ("Porter") submitted a third party function report detailing plaintiff's daily activities. (Tr. 152-160). She stated that plaintiff is unable to run, jog or play sports as he used to before the injury and that "he usually eats at my home because no income or job." (Tr. 153 & 154). She also stated that plaintiff is "afraid he won't have any income and become homeless" and that she "feel[s] bad because he's in constant pain and can't do things that he use to do - no income can't afford pain meds because no insurance." (Tr. 158).

On March 18, 2009, plaintiff submitted a request for a hearing before an ALJ, saying "it could be especially useful in my case since the administrative law judge would have an opportunity to hear an explanation as to how my impairments prevent me from working and restrict my activities." (Tr. 66 & 69). Also on March 18, 2009, plaintiff submitted a function

report similar to Porter's third party function report. He
stated that he is "a very restless sleeper because of stiffness
and numbness." (Tr. 142).

On April 16, 2009, plaintiff submitted a disability report
appeal form which described how his condition had changed since
his initial application. (Tr. 170-174). Plaintiff explained
that pain had spread to his right knee, hip and lower back and
that he needed to use his cane more frequently. (Tr. 170).
According to plaintiff, the increased pain "has caused me to slow
down drastically." (Tr. 172). On February 1, 2010, the ALJ
issued a notice to plaintiff that a hearing would be held to
determine whether he was eligible for SSDI and SSI. (Tr. 71-75).

On February 20, 2010, plaintiff saw Dr. Fraser for a follow
up evaluation. (Tr. 299). Dr. Fraser noted that plaintiff has
pain in his neck which worsens with activity and that he cannot
hold his head in one position for longer than 15 or 20 minutes.
(Tr. 299). Plaintiff also experiences constant back pain due to
several bulging discs in the lumbar spine. (Tr. 299). Dr.
Fraser remarked that plaintiff's "main complaint continues to be
right leg pain" and that "any bending, twisting or turning causes
him to have a significant discomfort." (Tr. 299). Plaintiff is
"unable to bend, squat, kneel, climb stairs, stand, sit, walk and
drive for prolonged periods" and "requires periods of rest
throughout the day making any gainful employment unfeasible."

(Tr. 300). Furthermore, plaintiff has "bilateral loss of function, chronic pain in both legs and his clinical condition is complicated by neck and lower back pain as well as ongoing depression." (Tr. 300). Dr. Fraser opined that plaintiff fulfills the requirements under Listing 1.02 for a major dysfunction of the extremity. (Tr. 300).

On March 11, 2010, plaintiff attended a hearing before the ALJ. (Tr. 21-47). Plaintiff testified that his girlfriend is currently supporting him with the SSI she is collecting. (Tr. 24). Plaintiff also stated that his right leg causes him significant pain and he predicted that he will require additional surgery to remove several loose screws from his right femur. (Tr. 27). Plaintiff testified that he watches television most of the day and has trouble sleeping through the night causing him to take naps of between 30 minutes and four hours "at least a couple times a day." (Tr. 30 & 39). Plaintiff also answered in the affirmative when the ALJ asked, "So would you say that Dr. Frazier [sic] is your primary care physician for your, your injuries?" (Tr. 31).

The ALJ then heard testimony from a vocational expert, Ruth Baruch ("Baruch"). Baruch stated that a person capable of doing sedentary unskilled work could hold a job as a table worker doing inspecting or sorting, a film touch-up screener or a surveillance monitor. (Tr. 42). Baruch also testified that plaintiff's past

17

relevant work would be classified as medium or heavy skilled work and that none of those skills would transfer to sedentary unskilled work. (Tr. 41-42). When plaintiff's attorney examined Baruch, she conceded that someone who required daily naps of up to four hours would not be able to perform any of those jobs. (Tr. 44-45).

On March 26, 2010, the ALJ issued his decision denying plaintiff's application for SSDI and SSI. The ALJ determined that though plaintiff has a severe medical impairment and is unable to perform his past relevant work, he retains a residual functional capacity to do sedentary unskilled work. (Tr. 12). Further, the ALJ decided that it was immaterial that plaintiff's previous work skills do not transfer to a sedentary unskilled position. (Tr. 13).

In considering plaintiff's symptoms, the ALJ relied on the notes from plaintiff's appointment on December 12, 2008, where plaintiff showed dramatic improvement in leg strength and range of motion. (Tr. 11). The ALJ also considered the long gaps in plaintiff's treatment record as evidence that plaintiff's account of constant or severe pain is not credible. (Tr. 12). According to the ALJ, Dr. Fraser's assessment of plaintiff's disability was not consistent with the medical evidence as a whole and was "the result of a one-time examination performed at the request of the claimant's representative for the sole purpose of support [sic]

18

the disability claim.  The note clearly indicates that Dr. Fraser

was not undertaking a treating relationship with [plaintiff]."

(Tr. 11).  The ALJ therefore afforded little evidentiary weight

to Dr. Fraser's conclusions.  (Tr. 11-12).

Considering plaintiff's age, education and experience, the

ALJ determined that plaintiff is not disabled under the Social

Security Act.  (Tr. 4-14).  On July 9, 2010, after the DRB failed

to complete its review, the ALJ's decision became the final

determination of the Social Security Administration.  (Tr. 1).

One month later, plaintiff filed this action.  (Docket Entry #

1).

## DISCUSSION

## I.  Jurisdiction and Standard of Review

Plaintiff seeks review of the Commissioner's final decision

pursuant to 42 U.S.C. § 405(g) ("section 405(g)").  Section

405(g) provides, in relevant part, "Any individual, after any

final decision of the Commissioner of Social Security made after

a hearing to which he was a party, irrespective of the amount in

controversy, may obtain a review of such decision by a civil

action commenced within sixty days."  The ALJ's decision became

final when the DRB failed to complete its review on July 9, 2010.

(Tr. 1).  Plaintiff filed this action within the prescribed 60

day limit on August 9, 2010.  (Docket Entry # 1).

This court has the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The factual findings of the Commissioner are treated as conclusive so long as they are "supported by substantial evidence." Id.; see also Atralis Condominium Ass'n v. Secretary of Housing and Urban Development, 620 F.3d 62, 66 (1st Cir. 2010) ("[t]he ALJ's factual findings are binding as long as they are supported by substantial evidence in the record as a whole"); accord Manso-Pizzaro v. Secretary of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996) ("[t]he Secretary's findings of fact are conclusive if supported by substantial evidence") (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

To be supported by substantial evidence, the Commissioner's factual findings must rely on "'more than a mere scintilla.'" Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Musto v. Halter, 135 F.Supp.2d 220, 225 (1st Cir. 2001) (quoting Rodriquez v. Secretary of Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991)). If the Commissioner's decision is supported by substantial evidence, the

court must defer to it even if alternative decisions are equally supported.  <u>Rodriquez Pagan v. Secretary of Health and Human Services</u>, 819 F.2d 1, 3 (1st Cirt. 1987).  The court is not bound, however, by factual findings that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).  It is therefore the task of this court to determine "whether the final decision is supported by substantial evidence and whether the correct legal standard was used."  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001).

II.  <u>Disability Determination</u>

An individual is disabled under the Social Security Act if that individual is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, the medical impairment must be of such severity that the individual "is not only unable to do his previous work but, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy."  <u>Id.</u>

The Social Security Act includes a five step evaluation process for determining whether an individual is disabled.  20

C.F.R. § 404.1520.  If it is possible to determine that an
individual is disabled or not disabled at any step, the
evaluation stops.  20 C.F.R. § 404.1520(a)(4).  In the first
step, the Commissioner must consider whether the individual is
engaged in any substantial gainful activity.  If so, the
Commissioner will determine that the individual is not disabled.
20 C.F.R. § 404.1520(a)(4)(i).  If not, the ALJ will move on to
step two of the evaluation.  Here, the ALJ correctly found that
plaintiff had not engaged in any substantial gainful activity
since the date of his alleged disability on December 6, 2004.
(Tr. 9).  The ALJ thus correctly proceeded to step two.

In the second step of the evaluation, the ALJ must consider
the severity of the individual's medical impairment or
combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  The
individual's medical impairment must be sufficiently severe to
significantly limit the individual's ability to perform basic
work activities and it must meet the duration requirement of at
least 12 months.  See 20 C.F.R. § 404.1521.  In this case, the
ALJ determined that plaintiff's chronic left knee pain and right
leg pain are severe because they limit "his ability to lift heavy
objects and ambulate effectively.  They have more than a minimal
effect on [plaintiff's] ability to perform work-related
activities."  (Tr. 10).  The ALJ thus continued to step three.

Like the second step, the third step of the evaluation

requires the ALJ to consider the severity of the individual's
impairments. If the impairment or combination of impairments
meets or equals a listing in Subpart P, Appendix 1, the ALJ will
determine that the individual is disabled. 20 C.F.R. §
404.1520(a)(4)(iii). Plaintiff argues that he meets the
requirements for Listing 1.02 for a major dysfunction of a joint.
(Docket Entry # 16). The ALJ determined, however, that
plaintiff's impairments do not constitute a major dysfunction of
the joint because there is no evidence of a "gross anatomical
deformity." (Tr. 10). According to Listing 1.02, a gross
anatomical deformity may include "subluxation, contracture, bony
or fibrous ankylosis [or] instability." 20 C.F.R. § 404, subpt.
P, app. 1. Plaintiff's medical record may contain evidence to
support a conclusion that he was suffering from the deformity of
instability, since his knees were said to buckle on a number of
occasions starting on October 12, 2005. (Tr. 238). Listing
1.02, however, also requires findings of "joint space narrowing,
bony destruction, or ankylosis." Because there is no evidence of
such a finding, the ALJ's determination that plaintiff did not
meet the requirements for Listing 1.02 is appropriate.

Before continuing to step four, it is necessary for the ALJ
to assess the individual's RFC. 20 C.F.R. § 404.1520(4). An
individual's RFC refers to "the most you can still do despite
your limitations." 20 C.F.R. § 404.1545(a)(1). This

determination is based on "your ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Here, the ALJ found that plaintiff had an RFC for a range of sedentary unskilled work. (Tr. 10). In making this determination, the ALJ relied on plaintiff's December 2008 evaluation where Dr. Fraser reported that plaintiff's condition was "exceptionally normal." (Tr. 11). The ALJ found that although plaintiff's injuries "could reasonably be expected to cause the alleged symptoms . . . [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 11).

Part of ALJ's task in making the RFC determination is resolving any conflicts of evidence. See Irlanda Ortiz v. Secretary of Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991); see also Richardson v. Perales, 402 U.S. at 399. Plaintiff's testimony and Dr. Fraser's reports that plaintiff is disabled from substantial gainful activity are in conflict with Dr. Gopal's and Dr. Jao's PRCF assessments. The ALJ attempts to resolve this conflict by finding that plaintiff is not credible and by affording little evidentiary weight to Dr. Fraser's opinion. (Tr. 11).

The ALJ's opinion discussed plaintiff's injury, the surgery on plaintiff's left knee in 2004 and plaintiff's evaluation from 2008, asserting that plaintiff "has sought minimal treatment

since his accident occurred approximately twelve years ago."
Based on the fact that plaintiff showed marked improvement in
December 2008, the ALJ then concludes that the opinions of
plaintiff are not credible because they are "not consistent with
the medical evidence as a whole." (Tr. 11). The ALJ makes no
mention, however, of the numerous medical evaluations plaintiff
underwent before and after the December 2008 evaluation which
could enhance his credibility regarding the severity and
frequency of his pain.[4] Plaintiff's evaluations, before and
after, report varying degrees of knee pain and lower back pain
with symptoms ranging from swelling and buckling to antalgic
gait. (Tr. 233, 237 & 238).

The ALJ assigned little evidentiary weight to Dr. Fraser's
opinion after determining that Dr. Fraser was merely a consulting
physician giving an "advocacy opinion." (Tr. 11). The ALJ's
decision that plaintiff is not disabled is therefore primarily

---

[4] Prior to the December 2008 evaluation, plaintiff's medical
records indicate a history of leg and back pain, including two
emergency room visits, two bone scans and multiple x-rays, the
2004 knee surgery and at least five evaluations where Dr. Fraser,
Dr. Brown and Dr. Warnick noted knee pain. (Tr. 176, 178, 181,
183, 185, 189-190, 193, 196, 200, 210, 234, 235, 236-237, 238 &
301-303). After the December 2008 evaluation, plaintiff
submitted remarks, a questionnaire and a function report
detailing his pain and how it affects his sleep and daily
activities. (Tr. 107, 137-138 & 141-151). In April 2009,
plaintiff reported that he required the assistance of his cane
more often. (Tr. 170-175). Finally, on February 20, 2010,
plaintiff visited Dr. Fraser and reported severe back, neck and
leg pain as well as ongoing depression. (Tr. 299-300).

based on Dr. Gopal's and Dr. Jao's PRFC assessments. (Tr. 12). The Commissioner concedes that it was an error to label Dr. Fraser as a consultant but argues that the ALJ may still reject the opinion of a treating physician with substantial evidence. (Docket Entry # 20).

The First Circuit does not require the ALJ to assign greater weight to Dr. Fraser simply because he was the treating physician. See Arroyo v. Secretary of Health and Human Services, 832 F.2d 82, 89 (1st Cir. 1991) ("[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians") (citing Tremblay v. Secretary of Health and Human Services, 676 F.2d 11, 13 (1st Cir. 1982)). Additionally, the reports of non-treating physicians may constitute substantial evidence. For example, the First Circuit in Berrios Lopez v. Secretary of Health and Human Services determined that the reports of non-treating physicians were substantial evidence because they contained more information than an average PRFC. Berrios Lopez, 951 F.2d 427, 431 (1st Cir. 1991). The court went on to note, however, that "[s]uch reports often contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight." Id. The reports of Dr. Gopal and Dr. Jao consist almost exclusively of checked boxes. To the extent that they contain analysis or

elaboration, they quote a few phrases from plaintiff's December 2008 evaluation.  (Tr. 223-230 & 239-246).  Dr. Fraser's notes, on the other hand, consist of several typed pages with observations and conclusions based on Dr. Fraser's examinations of plaintiff over a period of five years.  Dr. Gopal's and Dr. Jao's reports therefore do not constitute substantial evidence to contradict Dr. Fraser's opinion.  Thus, the ALJ's assessment of plaintiff's RFC is not supported by substantial evidence.

In the fourth step of the disability determination, the ALJ considers whether the individual's RFC allows the individual to continue doing past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Here, the ALJ correctly determined that plaintiff is disabled from returning to work as a window and siding installer or a roofer.  (Tr. 12).

The fifth and final step of the disability determination involves an inquiry into what other work the individual's RFC permits.  20 C.F.R. § 404.1520(a)(4)(v).  In addition to the individual's RFC, the ALJ must consider the individual's age, education and work experience.  Id.  If there are a significant number of jobs in the national economy which the individual could work, the individual is not disabled.  Id.; see also 20 C.F.R. § 404.1569.  Here, the ALJ relied on the testimony of a vocational expert to assist in the determination.  In response to the ALJ's hypothetical, the vocational expert stated that an individual

capable of performing sedentary unskilled work could be employed as a table worker, a surveillance monitor or a film touch up screener. (Tr. 42). When the expert was examined by plaintiff's attorney, however, she agreed that someone with plaintiff's additional limitations (specifically, the need to sleep for between 30 minutes and four hours during the day) would not be able to perform any of those jobs. (Tr. 45-46). The ALJ's decision does not address this conflict nor provide substantial evidence for his conclusion that plaintiff is able to perform those jobs. Additionally, because the ALJ's assessment of plaintiff's RFC was not supported by substantial evidence, the ALJ's determination that plaintiff is capable of doing other work is likewise flawed.

The ALJ is required to review the medical record as a whole. "While the ALJ is free to make a finding which gives less credence to certain evidence, he cannot simply ignore . . . the 'body of evidence opposed to [his] view.'" Dedis v. Chater, 956 F.Supp. 45, 51 (D.Mass. 1997) (quoting Diaz v. Secretary of Health and Human Services, 791 F.Supp. 905, 912 (D.P.R. 1992)); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of

evidence opposed to the Board's view"). If the ALJ reaches
conclusions by ignoring certain evidence, then the conclusions
are not supported by substantial evidence. See Nguyen, 172 F.3d
at 35. In this case, the ALJ reached the determination that
plaintiff is not disabled by ignoring evidence related to Dr.
Fraser's treatment of plaintiff and by focusing on plaintiff's
improved condition during one evaluation to the exclusion of all
other evaluations. Consequently, this court is not bound to
defer to the ALJ's conclusions.

III. Remedy

According to section 405(g), this court may reverse or
modify the Commissioner's decision with or without remanding the
cause to the Social Security Administration. Generally, however,
a court will only reverse a denial of benefits if the evidence
that the individual is disabled is extraordinary. See Seavey,
276 F.3d at 11 ("a judicial award of benefits would be proper
where the proof of disability is overwhelming or where the proof
is very strong and there is no contrary evidence"). If, however,
an "essential factual issue has not been resolved" or "there is
no clear entitlement to benefits," the court is obliged to
remand. Id.

In this case, there are several factual issues to be
resolved. The ALJ's decisions that plaintiff was not credible
and that Dr. Fraser's conclusions carry little weight were not

supported by substantial evidence. Additionally, the ALJ did not consider the body of evidence as a whole in making his credibility determinations. On the other hand, proof that plaintiff is disabled is not overwhelming. Plaintiff's condition showed significant improvement, at least in December 2008. The proper remedy is therefore to remand the cause to the Commissioner of the Social Security Administration for a rehearing.

## CONCLUSION

In accordance with the foregoing discussion, the Commissioner's motion for an order affirming the decision of the Commissioner (Docket Entry # 19) is **DENIED** and plaintiff's motion for an order to reverse or remand the decision of the Commissioner (Docket Entry # 15) is **ALLOWED** to the extent that it seeks remand.


             /s/  Marianne B. Bowler
        **MARIANNE B. BOWLER**
        United States Magistrate Judge